IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:19-CV-502-D

BRASWELL EGG COMPANY, INC., )
                              )
               Plaintiff,     )
                              )
          v.                  )         **ORDER**
                              )
POULTRY MANAGEMENT SYSTEMS, INC., )
                              )
               Defendant.     )

On October 28, 2019, Braswell Egg Company, Inc. d/b/a Braswell Family Farms ("Braswell" or "plaintiff") filed a complaint against Poultry Management Systems, Inc. ("PMSI" or "defendant), alleging two breach of contract claims and a negligence claim [D.E. 1-2]. On December 3, 2019, PMSI moved for judgment on the pleadings [D.E. 13] and filed a memorandum in support [D.E. 14]. See Fed. R. Civ. P. 12(c). On December 20, 2019, Braswell responded in opposition [D.E. 16]. On January 14, 2020, PMSI replied [D.E. 19]. As explained below, the court grants in part and denies in part PMSI's motion for judgment on the pleadings.

I.

Braswell is a family-owned company in Nash County, North Carolina that produces eggs. See Compl. [D.E. 1-2] ¶¶ 5–6. On June 8, 2016, Braswell purchased the Command III System ("the Command III") and a Natural On-line Animal Housing Computer Watchdog Timer ("the Watchdog Timer") from PMSI. See id. at ¶¶ 7–13. The Command III is a hardware system that allows its user to "monitor remotely all aspects of egg production, like the poultry's feed and water intake, the light intensity inside each poultry house, and weather conditions." Id. at ¶ 9. The Command III, when coupled with the Watchdog Timer, also allows its user to monitor the temperature of its installation location. See id. at ¶ 10.

Braswell and PMSI executed a signed Quotation for Command III Egg Flow/Environmental Control Features ("the price quote"). See [D.E. 1-2] 10–13. The price quote listed the estimated cost of the Command III as $90,399.50. See id. at 12; Compl. ¶ 16. The price quote also included "Installation Supervisor at Actual Cost" in one column and "Estimate . . . OPEN" in the corresponding across column, while noting that "(Installation and Fiber Optics are estimates only and can effect [sic] total)." [D.E. 1-2] 12. According to Braswell, when it signed the price quote, "PMSI represented to Braswell that it only was 'lock[ing] in' the price of the Command III hardware." Compl. ¶ 20 (alteration in original). Moreover, "[r]elying on industry practice, when Braswell signed the Price Quote, it believed that an additional contract—one that outlined more fully the parties' rights, duties, and obligations—would be coming." Id. at ¶ 21. A paragraph underneath the signature line of the price quote stated:

> Terms: ALL PURCHASES FROM POULTRY MANAGEMENT SYSTEMS, INC. SHALL BE GOVERNED BY ITS STANDARD TERMS OF SALE, A COPY OF WHICH MAY BE OBTAINED BY CALLING (616) 642-9050, WRITING US AT 6245 Grand River Ave., Saranac, MI. OR BY VISITING OUR WEBSITE AT www.PMSI.cc WE OBJECT TO ANY DIFFERENT OR ADDITIONAL TERMS, EXCEPT TO THE EXTENT, IF ANY, THAT WE HAVE ACCEPTED THEM IN A SIGNED WRITING.

[D.E. 1-2] 12. This paragraph had the same font style as the rest of the price quote but a different font size and color. See id. According to Braswell, PMSI never mentioned or provided a copy of the standard terms of sale referred to in this paragraph. See Compl. ¶¶ 46–49.

PMSI's standard terms of sale, referred to in the paragraph underneath the signature line, contains a time bar for bringing legal action: "Any action that Buyer brings against Seller for breach of this Agreement or for any other claim that arises out of or relates to the goods or their design, manufacture, sale or delivery or the services <u>must be brought within one year after the cause of action accrues</u>." [D.E. 11-2] ¶ 18 (emphasis added). PMSI's standard terms of sale also contains a waiver for tort liability and a limitation on consequential damages:

> SELLER SHALL NOT HAVE ANY TORT LIABILITY TO BUYER OR ANY

2

> OTHER PERSON WITH RESPECT TO ANY OF THE GOODS OR SERVICES AND SHALL NOT BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL, EXEMPLARY, INDIRECT OR PUNITIVE DAMAGES ARISING FROM ANY PRODUCT DEFECT, DELAY, NONDELIVERY, RECALL OR OTHER BREACH. BUYER SHALL NOT HAVE ANY RIGHT OF REJECTION OR OF REVOCATION OF ACCEPTANCE OF THE GOODS.

Id. at ¶ 7(g). As for remedies, PMSI's standard terms of sale provides that "[i]n the event of a defect in any Products constituting a breach of the warranty provided herein, Seller will at its option either (i) repair or replace such Product free of charge (F.O.B. Seller's plant), or (ii) in lieu of repair or replacement, refund to Buyer the original purchase price less the reasonable value of Buyer's use of the Products." Id. at ¶ 7(c). As for the governing law, "[t]his agreement between Seller and Buyer shall be considered to have been made in the State of Michigan, and it shall be governed by and interpreted according to Michigan law . . . ." Id. at ¶ 19.

On October 8, 2016, a PMSI technician installed the Command III and Watchdog Timer on Braswell's poultry house number 3 ("House 3"), which contained numerous hens. See Compl. at ¶¶ 8, 22, 36. PSMI provided Braswell with a copy of its field service policy at that time. See id. at ¶ 23; [D.E. 1-2] 14–21. According to Braswell, "[b]oth Braswell and PMSI intended the Field Service Policy to address the installation of the Command III and Watchdog Timer." Compl. ¶ 24. In the field service policy, PMSI stated that one of its technicians will perform the following at the time of installation:

1. Supervise or connect all wires and adjust Central Computer equipment.
2. Test computer
3. Instruct the customer's personnel in the operation and maintenance of the equipment.
4. Assist in the operation of the equipment on a production basis.

[D.E. 1-2] 15. As for Braswell, its duties included "[u]npack[ing] and inspect[ing] the equipment for obvious shipping damage," "[p]osition[ing] the equipment in the desired location," and "[i]nstall[ing] required services" such as "all sensing controlling equipment." Id. In addition, the field service policy required Braswell to "[h]ave present at the equipment all operating and

3

maintenance personnel who operate and maintain the equipment, to receive instructions from the PMSI technician" and "[r]ender all reasonable assistance as requested by the PMSI technician." Id. The field service policy also stated: "Upon completion of the service period, the customer [i.e., Braswell] will be presented with the PMSI Standard Release Form for acceptance by a responsible representative of the customer [i.e., Braswell]. This certifies to PMSI that the technician has performed those services contracted for as mentioned above and the equipment is performing in accordance with specifications." Id. The field service policy did not mention PMSI's standard terms of service. Cf. id. at 14–21; see Compl. ¶¶ 53–54.

When installing the Watchdog Timer, PMSI agreed to program the Watchdog Timer to report temperature irregularities lasting for more than 8 minutes. See Compl. ¶ 31. Instead, PMSI's technician programmed the Watchdog Timer to report temperature irregularities lasting for more than 88 minutes. See id. at ¶ 33. On January 13, 2017, a power anomaly tripped House 3's circuit breaker. See id. at ¶ 34. This anomaly caused the temperature of House 3 to significantly increase. See id. at ¶ 35. Braswell did not receive notification until 88 minutes passed. As a result, roughly 221,590 hens perished. See id. at ¶ 37.

In early 2019, Braswell contacted PMSI concerning the failure of the Watchdog Timer and the dead hens. See id. at ¶ 40. PMSI initially negotiated with Braswell and asked to see documentation concerning Braswell's damages. See id. at ¶ 41. In September 2019, PMSI stopped negotiating and disclaimed liability via its standard terms from the price quote. See id. at ¶ 42. On October 8, 2019, Braswell filed suit.

Braswell makes three claims against PMSI. First, Braswell alleges that PMSI's faulty installation of the Watchdog Timer breached the field service policy contract. See Compl. ¶¶ 56–65. Second, in the alternative, Braswell alleges that PMSI breached the price quote contract. See id. at ¶¶ 66–75. Third, in the alternative to both the first and second breach claims, Braswell alleges that

4

PMSI negligently installed the Watchdog Timer. See id. at ¶¶ 76–81. Braswell seeks damages and reasonable attorneys' fees.

In seeking judgment on the pleadings, PMSI makes four arguments. First, Michigan law governs the price quote contract and permits both incorporation by reference of PMSI's terms of service and a 1-year claim limitation period. See [D.E. 14] 6–11. Second, the 1-year claim limitation period in PMSI's terms of service, as incorporated into the price quote, bars Braswell's claims. See id. at 5–6. Third, PMSI's terms of service disclaims tort liability arising from the contract and prevents Braswell from recovering consequential damages. See id. at 11–12, 14–15. Fourth, the economic loss rule bars Braswell's negligence claim. See id. at 12–14. Implicitly, PMSI argues that the price quote, not the field service policy, constitutes the governing contract between the parties. Cf. id. at 5–14.

Braswell responds with three main arguments. First, Braswell argues that the field service policy really governs the contractual relations between the parties. See [D.E. 16] 7–13. Second, Braswell argues that even if the price quote contract governs, PMSI's terms of service do not bar Braswell's breach claim or negligence claim. See id. at 13–18. Alternatively, Braswell contends that PMSI's terms of service are unenforceable as unconscionable. See id. at 16–18. Third, Braswell argues that the economic loss rule does not bar Braswell's negligence claim. See [D.E. 16] 19.

In reply, PMSI asserts that PMSI and Braswell entered into a single contract—the price quote—that governs both the purchase and installation of the Command III and Watchdog Timer. See [D.E. 19] 1–9. PMSI also asserts that the economic loss rule applies because Braswell has not alleged that PMSI was negligent concerning a duty separate and apart from any contractual duty in the price quote See id. at 9–10.

II.

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A

5

motion for judgment on the pleadings should be granted if "the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." Park Univ. Enters. v. Am. Cas. Co. of Reading, 442 F.3d 1239, 1244 (10th Cir. 2006) (quotation omitted), abrogated on other grounds by Magnus, Inc. v. Diamond State Ins. Co., 545 F. App'x 750 (10th Cir. 2013) (unpublished); see Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 375 (4th Cir. 2012); Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 405–06 (4th Cir. 2002).

The same standard applies to a motion for judgment on the pleadings as to a motion to dismiss for failure to state a claim. See Burbach Broad. Co., 278 F.3d at 405–06. When a court evaluates a motion for judgment on the pleadings, it must construe the facts and reasonable inferences "in the light most favorable to the [nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 347, 352–53 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015); Burbach Broad. Co., 278 F.3d at 406. A court must determine whether a pleading is legally and factually sufficient. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80, 684 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–70 (2007); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). A pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. Moreover, a court need not accept a pleading's legal conclusions drawn from the facts. Iqbal, 556 U.S. at 678–79; Giarratano, 521 F.3d at 302. Similarly, a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted).

In evaluating a motion for judgment on the pleadings, the court may consider the pleadings and any materials referenced in or attached to the pleadings, which are incorporated by reference. See Fed. R. Civ. P. 10(c); Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir.

6

1991). A court also may consider "matters of which a court may take judicial notice," such as public records. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). In addition, a court may consider documents attached to a motion for judgment on the pleadings so long as those documents are "integral to the complaint" and authentic. Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009); see Rockville Cars, LLC v. City of Rockville, Md., 891 F.3d 141, 145 (4th Cir. 2018).

A.

Before addressing whether the price quote serves as the single operative contract between the parties, the court must determine which law to apply in analyzing the price quote and the field service policy. PMSI argues that the price quote requires Michigan law to apply because it incorporates by reference PMSI's terms of service, which states that "[t]his agreement between Seller and Buyer shall be considered to have been made in the State of Michigan, and it shall be governed by and interpreted according to Michigan law." [D.E. 11-2] ¶ 19; see [D.E. 14] 6–11. Braswell responds there are two contracts at issue and that a federal court sitting in diversity applies the choice-of-law rules of the forum state. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); DiFederico v. Marriott Int'l, Inc., 714 F.3d 796, 807 (4th Cir. 2013); Fed. Ins. Co. v. S. Lithoplate, Inc., 7 F. Supp. 3d 579, 583 (E.D.N.C. 2014). Moreover, under North Carolina law, the "substantive law of the state where the last act to make a binding contract occurred, usually delivery of the policy, controls the interpretation of the contract." Fortune Ins. Co. v. Owens, 351 N.C. 424, 428, 526 S.E.2d 463, 466 (2000).

Viewing the record in the light most favorable to Braswell, Braswell and PMSI agreed to the price quote in North Carolina, with Braswell's Executive Vice President Ronald S. Braswell III serving as signatory. See Compl. at ¶ 13; [D.E. 1-2] 12. However, North Carolina will honor a valid contractual choice of law. See, e.g., Vizant Techs., LLC v. YRC Worldwide, Inc., 373 N.C. 549, 556, 838 S.E.2d 616, 620 (2020); Perkins v. CCH Computax, Inc., 333 N.C. 140, 144 n.1, 423

7

S.E.2d 780, 783 n.1 (1992). Thus, Michigan law applies to the price quote contract. Moreover, because the last act to make field service policy contract binding occurred in North Carolina, North Carolina law applies to that contract. See Fortune Ins. Co., 351 N.C. at 428, 526 S.E.2d at 466.

The motion for judgment on the pleadings requires the court to consider Braswell's claims under North Carolina or Michigan law. Accordingly, this court must predict how the applicable state's highest court would rule on any disputed state law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the applicable state's highest court. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from those courts, this court may consider the opinions of the Michigan and North Carolina courts of appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted). In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there [are] persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmerman, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

Viewing the record in the light most favorable to Braswell, both the price quote contract and field service policy contract are distinct, enforceable agreements between the parties. In North Carolina, "[a] valid contract requires an offer, an acceptance, and sufficient consideration." China Grove 152, LLC v. Town of China Grove, 242 N.C. App. 1, 9, 773 S.E.2d 566, 572 (2015); see Yeager v. Dobbins, 252 N.C. 824, 828, 114 S.E.2d 820, 823–24 (1960); Copy Prods., Inc. v.

8

Randolph, 62 N.C. App. 553, 555, 303 S.E.2d 87, 88 (1983). The price quote is a valid contract. It contained PMSI's offer to sell the Command III and Watchdog Timer. Braswell accepted this offer by signing the price quote. The parties exchanged consideration when Braswell received these items and PMSI received $91,230.32. See Compl. ¶¶ 7–16; [D.E. 1-2] 12. The field service policy contract also is a valid contract. It contained PMSI's offer to install the Command III and Watchdog Timer. Braswell accepted this offer by permitting PMSI's technician to install these items, and the parties exchanged consideration when Braswell had the item installed and PMSI received payment from Braswell for the installation. See Compl. ¶¶ 22–31; [D.E. 1-2] 14–21; Snyder v. Freeman, 300 N.C. 204, 217–18, 266 S.E.2d 593, 602–03 (1980).

B.

The price quote contract governs only the sale of the Command III and Watchdog Timer, and not the installation of both items, for three reasons. First, the price quote contains no material terms concerning installation. It does not mention either Braswell's or PMSI's rights, duties, or legal obligations concerning the installation of the Command III and Watchdog Timer. Cf. [D.E. 1-2] 10–13. To be sure, the price quote notes the installation in two places: 1) "Installation Supervisor at Actual Cost" in one column and "Estimate . . . OPEN" in the corresponding across column and 2) "(Installation and Fiber Optics are estimates only and can effect [sic] total)." Id. at 12. But these passing references do not delineate any specific, let alone substantive, duty, right, or obligation. Cf. Elks v. N. State Life Ins. Co., 159 N.C. 619, 626, 75 S.E. 808, 811 (1912) ("The offer, even if intended to create legal relations, must be so complete that, upon acceptance, an agreement is formed which contains all the terms necessary to determine whether the contract has been performed or not." (quoting 1 Page on Contracts § 27)). Moreover, although Braswell may have stated in its complaint that "[a]s part of that [price quote] contract, PMSI agreed to install the Watchdog Timer with certain specifications[,]" it made this assertion as part of an alternative claim for breach of the price quote, and not as part of the main claim for breach of the field service policy. Compl. ¶ 69.

9

Second, the field service policy contract contains material terms concerning installation. Indeed, it states explicitly that it is a contract for <u>services</u>: "Upon completion of the service period, the customer will be presented with the PMSI Standard Release Form for acceptance by a responsible representative of the customer. This certifies to PMSI that the technician has <u>performed those services contracted for as mentioned above</u>." [D.E. 1-2] 15 (emphasis added). These "services" from PMSI include "[s]upervis[ing] or connect[ing] all wires and adjust[ing] Central Computer equipment," "[t]est[ing] [the] computer," "[i]nstruct[ing] the customer's personnel in the operation and maintenance of the equipment," and "[a]ssist[ing] in the operation of the equipment on a production basis." <u>Id.</u> Braswell's duties entailed "[u]npack[ing] and inspect[ing] the equipment for obvious shipping damage," "[p]osition[ing] the equipment in the desired location," "[i]nstall[ing] required services" such as "all sensing controlling equipment." <u>Id.</u> In addition, Braswell had to "[h]ave present at the equipment all operating and maintenance personnel who operate and maintain the equipment, to receive instructions from the PMSI technician" and "[r]ender all reasonable assistance as requested by the PMSI technician." <u>Id.</u> In contrast, the price quote lacks any detail as to how installation is to be performed—a natural consequence of its nature as a sales, and not an installation or service, contract.

Third, Braswell and PMSI's actual course of performance demonstrates that they did not intend for the price quote to govern the Command III and the Watchdog Timer's installation. Under the Uniform Commercial Code, "[t]he parties if they so intend can conclude a contract for sale even though the price is not settled." N.C. Gen. Stat. § 25-2-305(1). In accordance with the parol evidence rule, the court can divine intent "by course of dealing or usage of trade or by course of performance." <u>Id.</u> § 25-2-202(a) (citations omitted); see <u>Ace, Inc. v. Maynard</u>, 108 N.C. App. 241, 246–47, 423 S.E.2d 504, 508 (1992). "[T]he course of actual performance by the parties is considered the best indication of what they intended the writing to mean." N.C. Gen. Stat. § 25-2-202 cmt. n.2. The price quote lists the price for many aspects of the Command III, but left the

10

price for installation as "at Actual Cost" and "OPEN." [D.E. 1-2] 12. Moreover, at the time of the price quote contract, "PMSI represented to Braswell that it only was 'lock[ing] in' the price of the Command III hardware." Compl. at ¶ 20 (alteration in original). As discussed, the price quote does not contain details concerning the installation of the Command III and Watchdog Timer, while the field services policy does. Accordingly, viewing the record in the light most favorable to Braswell, Braswell and PMSI did not intend for the price quote to govern both the sale and installation of the Command III and Watchdog Timer.

In opposition, PMSI argues that the field services policy did not form a separate contract between the parties because it did not include a valid offer or separate consideration. See [D.E. 19] 2–3. As for the offer, PMSI contends that there was no second offer (i.e., the field services policy offer) to accept because the price quote already included the Command III and Watchdog Timer's installation. Yet, as discussed, the references that PMSI cites in support are inconclusive. As for the consideration, PMSI claims that the field services policy's fee schedule merely breaks down the price quote's "Actual Cost" pricing. As such, Braswell's payment to PMSI cannot constitute separate consideration because "it is generally held that 'a promise to perform an act which such promisor is already bound to perform is insufficient consideration for a promise by the adverse party.'" Sinclair v. Travis, 231 N.C. 345, 354, 57 S.E.2d 394, 400 (1950) (quoting 12 Am. Jur. Contracts § 113).

Viewing the record in the light most favorable to Braswell, PMSI's argument does not fit the facts. The field services policy contract imposed numerous new duties upon Braswell, triggered both "[u]pon receipt of equipment and prior to arrival of PMSI technician" and "[u]pon arrival of the PMSI technician." [D.E. 1-2] 15. Accordingly, new consideration did exist and so did a new binding agreement between Braswell and PMSI in the form of the field services policy contract.

11

III.

A.

As for Braswell's first claim, the field services policy contract outlined PMSI's duties as part of the contract. Specifically, it required PMSI's technician to connect all wires of the Command III (including the Watchdog Timer) and adjust the equipment, test the Command III, instruct Braswell's employees in the operation and maintenance of the Command III, and assist in the operation of the Command III. See [D.E. 1-2] 15. Braswell alleges that "PMSI either entirely failed to perform the aforementioned tasks, or, at the very least, failed to perform them adequately." Compl. ¶ 29. Moreover, "[w]hen it installed the Watchdog Timer in House 3, PMSI agreed to program the Watchdog Timer to report temperature irregularities lasting for more than eight minutes." Id. at ¶ 31. Instead of programming the Watchdog Timer for 8 minutes, however, PMSI's technician programmed it for 88 minutes, causing the loss of approximately 221,590 hens when a circuit breaker tripped due to a power anomaly. See id. at ¶¶ 33–34, 37. Viewing the record in the light most favorable to Braswell, this alleged error, coupled with Braswell's other allegations concerning PMSI's faulty installation, defeats PMSI's motion for judgment on the pleadings on this claim.

B.

As for Braswell's breach of the price quote contract claim, the court initially must use North Carolina law in interpreting whether the price quote incorporated by reference PMSI's terms of service, which includes the 1-year time bar. "To incorporate a separate document by reference is to declare that the former document shall be taken as part of the document in which the declaration is made, as much as if it were set out at length therein." Booker v. Everhart, 294 N.C. 146, 152, 240 S.E.2d 360, 363 (1978); see Montessori Children's House of Durham v. Blizzard, 244 N.C. App. 633, 637, 781 S.E.2d 511, 514 (2016) ("When a contract expressly incorporates a document by reference, however, that document becomes a part of the parties' agreement."). Moreover, "[o]ne who signs a written contract without reading it, when he can do so understandingly, is bound thereby

12

unless the failure to read is justified by some special circumstance." Davis v. Davis, 256 N.C. 468, 472, 124 S.E.2d 130, 133 (1962).

The price quote contract contains language that expressly incorporates by reference PMSI's terms of service under North Carolina law. To illustrate, "ALL PURCHASES FROM POULTRY MANAGEMENT SYSTEMS, INC. SHALL BE GOVERNED BY ITS STANDARD TERMS OF SALE." [D.E. 1-2] 12. The price quote also stated: "WE OBJECT TO ANY DIFFERENT OR ADDITIONAL TERMS, EXCEPT TO THE EXTENT, IF ANY, THAT WE HAVE ACCEPTED THEM IN A SIGNED WRITING." Id. And PMSI provided a physical address, an internet address, and a phone number at which a copy of PMSI's terms of service may be obtained. See id. Taken together, these portions of the price quote demonstrate that the parties incorporated by reference PMSI's terms of service and did so both expressly and specifically. See Booker, 294 N.C. at 152, 240 S.E.2d at 363; Blizzard, 244 N.C. App. at 637, 781 S.E.2d at 514.

In opposition, Braswell principally relies upon two cases. First, Braswell cites Hopkins v. MWR Management Company, No. 15-CVS-697, 2017 NCBC 46, 2017 WL 2380227, at *1 (N.C. Super. Ct. May 31, 2017) (unpublished), for the proposition that "similar general references [like the price quote's] were not enough to satisfy the express incorporation standard." [D.E. 16] 15. But Hopkins concerned an employment agreement's alleged incorporation by reference of an employee handbook (ungoverned by the UCC) which expressly "contain[ed] a disclaimer that it should not 'be construed as being or creating any terms or conditions of an employment contract express or implied.'" Hopkins, 2017 WL 2380227, at *21. In contrast, the price quote contract—governed by the UCC—does not concern an employment contract and does not contain language that disclaims its own applicability. Cf. [D.E. 1-2] 12. Second, Braswell contends that the price quote contract fails incorporation by reference's essential purpose "that the material to be incorporated is so well known to the contracting parties that a mere reference to it is sufficient" as distilled in Smith v. Marez, 217 N.C. App. 267, 277, 719 S.E.2d 226, 277 (2011) (quotation omitted). See [D.E. 16]

13

15–16. But Marez concerned a North Carolina court's interpretation of New York contract law, not North Carolina contract law. See Marez, 217 N.C. App. at 271, 719 S.E.2d at 229. In contrast, the price quote in this case expressly and specifically called attention to its incorporation by reference of PMSI's terms of service. Under North Carolina law, the term is enforceable whether Braswell read it or not. See Davis, 256 N.C. at 472, 124 S.E.2d at 133.

Once triggered, PMSI's terms of service mandate that Michigan law apply to the price quote contract. The price quote contract states that "[t]his agreement between Seller and Buyer shall be considered to have been made in the State of Michigan, and it shall be governed by and interpreted according to Michigan law." [D.E. 11-2] ¶ 19. Accordingly, the court applies Michigan law.

Under Michigan law, "[a]n action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than 1 year but may not extend it." Mich. Comp. Laws § 440.2725(1). Specifically, "an unambiguous contractual provision providing for a shortened period of limitations is to be enforced as written unless the provision would violate law or public policy." Rory v. Cont'l Ins. Co., 473 Mich. 457, 470, 703 N.W.2d 23, 31 (2005); see Tolles v. Mid-Mich. Visiting Nurse Ass'n, No. 19-10402, 2020 WL 887897, at *3 (E.D. Mich. Feb. 24, 2020) (unpublished); Allard v. Allard, 318 Mich. App. 583, 601, 899 N.W.2d 420, 430 (2017). As for a time bar violating the law, Michigan courts consistently have "held that contractually shortened periods of limitations were valid, and were to be disregarded only where the insured could establish estoppel or prove that the insurer waived the contractual provision." Rory, 473 Mich. at 471, 703 N.W.2d at 32. As for a time bar violating public policy, Michigan has "no general policy or statutory enactment . . . which would prohibit private parties from contracting for shorter limitations periods than those specified by general statutes." Id., 703 N.W.2d at 32.

PMSI's terms of service includes a 1-year time bar. It states: "Any action that Buyer brings against Seller for breach of this Agreement or for any other claim that arises out of or relates to the

14

goods or their design, manufacture, sale or delivery or the services <u>must be brought within one year</u> after the cause of action accrues." [D.E. 11-2] ¶ 18 (emphasis added). On January 13, 2017, Braswell suffered its alleged loss. See Compl. ¶ 34. Thus, Braswell had until January 13, 2018, to bring a claim against PMSI. Braswell instead brought suit on October 8, 2019. Accordingly, the 1-year time bar prevents liability for PMSI concerning any breach of the price quote.

In opposition, Braswell contends that PMSI's terms of service are both procedurally and substantively unconscionable under Michigan law. See [D.E. 16] 16–18. In Michigan, "[b]oth procedural and substantive unconscionability are required in order to hold a provision or an entire agreement unconscionable." Whirlpool Corp. v. Grigoleit Co., 713 F.3d 316, 323 (6th Cir. 2013).

As for procedural unconscionability, a court should "evaluat[e] the bargaining power of the parties, their relative economic strength, and their alternative sources of supply." Id. at 322. "The most important factors in determining procedural unconscionability are (1) whether the relatively weaker party had an alternative source with which it could contract, and (2) whether the contract term in question was in fact negotiable." Id. (quotation and alteration omitted). Braswell and PMSI are both sophisticated private parties (i.e., with roughly equal bargaining power), and courts rarely find unconscionability in a commercial context. See id. In addition, Braswell has not claimed that it lacked an alternative source with which it could contract. Rather, Braswell claims that "PMSI did not allow Braswell to read and review its Terms and Conditions before it agreed to them." [D.E. 16] 17. Yet the price quote incorporated by reference PMSI's terms of service underneath the signature line and Braswell makes no claim that it did not read the price quote itself. Thus, the price quote between Braswell and PMSI does not fall into the type of procedurally unconscionable contract present in "those [cases] where parties are given no opportunity to review or read an agreement before signing it." Whirlpool, 713 F.3d at 322. Braswell also claims that the price quote is the sort of procedurally unconscionable contract such as "those where damages are limited even were a contract is wholly unperformed." Id.; see [D.E. 16] 17. However, the relevant issue for the price

15

quote is not whether PMSI wholly unperformed, but whether the 1-year time bar applies. Accordingly, the court rejects Braswell's procedural unconcsionability argument. See Whirlpool, 713 F.3d at 322–23.

To find substantive unconscionability, a court must hold that the contract term is substantively unreasonable. See, e.g., Allen v. Mich. Bell Tel. Co., 18 Mich. App. 632, 638, 171 N.W.2d 689, 692 (1969) ("[M]erely because the parties have different options or bargaining power, unequal or wholly out of proportion to each other, does not mean that the agreement of one of the parties to a term of a contract will not be enforced against him; if the term is substantively reasonable it will be enforced."). The 1-year time bar in PMSI's terms of service is expressly permitted by law and public policy. See Mich. Comp. Laws § 440.2725(1); Rory, 473 Mich. at 470, 703 N.W.2d at 31. It was not made in the context of "extreme, blatant, unavoidable inequities." Whirlpool, 713 F.3d at 322. Accordingly, the 1-year time bar in the price quote contract is not procedurally or substantively unconscionable. Thus, the 1-year time bar in PMSI's terms of service—incorporated by reference into the price quote contract—bars Braswell's breach of contract claim concerning the price quote contract.

C.

As for Braswell's alternative negligence claim arising from the faulty installation of the Watchdog Timer, PMSI argues that the economic loss rule bars the claim. "The economic loss rule addresses the intersection between contract remedies (including warranty remedies) and tort remedies." Kelly v. Georgia Pac. LLC, 671 F. Supp. 2d 785, 792 (E.D.N.C. 2009). "Ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978), rejected in part on other grounds by Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc., 313 N.C. 230, 328 S.E.2d 274 (1985). The economic loss rule makes sense, in part, because "'parties to a contract do not thereby become each others' fiduciaries; [therefore,] they generally owe no

16

special duty to one another beyond the terms of the contract.'" Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir.1998) (quoting Branch Banking & Trust Co. v. Thompson, 107 N.C. App. 53, 61, 418 S.E.2d 694, 699 (1992)). To pursue a tort claim and a breach of contract claim concerning the same conduct, "a plaintiff must allege a duty owed him by the defendant separate and distinct from any duty owed under a contract." Vanwyk Textile Sys., B.V. v. Zimmer Mach. Am., Inc., 994 F. Supp. 350, 362 (W.D.N.C. 1997) (emphasis omitted); see Broussard, 155 F.3d at 346; Strum v. Exxon Co., 15 F.3d 327, 330–31 (4th Cir. 1994); Paine, Webber, Jackson & Curtis, Inc. v. Stanley, 60 N.C. App. 511, 516–17, 299 S.E.2d 292, 295–96 (1983). North Carolina courts have "carefully circumscribed" this independent duty requirement. Strum, 15 F.3d at 331. In so doing, North Carolina courts have strived to keep tort and contract law (including law related to warranties) within their separate spheres. Cf. East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 870–71 (1986). Accordingly, North Carolina courts have developed (and the Fourth Circuit has applied) the economic loss rule, which prohibits recovery for purely economic loss in tort when a contract, a warranty, or the UCC operates to allocate risk. See, e.g., 2000 Watermark Ass'n v. Celotex Corp., 784 F.2d 1183, 1186 (4th Cir. 1986) (applying South Carolina law); Kelly, 671 F. Supp. 2d at 792 (applying North Carolina law); Ellis–Don Constr., Inc. v. HKS, Inc., 353 F. Supp. 2d 603, 606–07 (M.D.N.C. 2004) (applying North Carolina law); Wilson v. Dryvit Sys., Inc., 206 F. Supp. 2d 749, 753–54 (E.D.N.C. 2002) (applying North Carolina law), aff'd, 71 F. App'x 960 (4th Cir. 2003); Oates v. JAG, Inc., 314 N.C. 276, 277, 333 S.E.2d 222, 223–24 (1985); N.C. State Ports Auth., 294 N.C. at 81, 240 S.E.2d at 350.

Braswell states in its complaint: "Because PMSI undertook to install and program the Watchdog Timer, PMSI owed Braswell a duty of care to install and program the Watchdog Timer with the skill of an ordinary, prudent, and reasonable person." Compl. ¶ 78. This alleged duty, however, is not separate and distinct but part and parcel of the parties contractual duty under the field

17

services policy. See Kelly, 671 F. Supp. 2d at 792.[1] Thus, Braswell has not plausibly alleged any separate duty owed by PMSI in the installation of the Command III and Watchdog Timer.

IV.

In sum, the court GRANTS in part and DENIES in part defendant's motion for judgment on the pleadings [D.E. 13]. Plaintiff's claim for breach of the field service policy contract (claim 1) survives, but the court DISMISSES plaintiff's breach of the price quote contract claim (claim 2) and negligence claim (claim 3).

SO ORDERED. This 24 day of August 2020.

JAMES C. DEVER III
United States District Judge

---

[1] As explained in Kelly, this court rejects Braswell's reliance on Lord v. Customized Consulting Specialty, Inc., 182 N.C. App. 635, 643 S.E.2d 28 (2007). See Kelly, 671 F. Supp. 2d at 793–96.